Warren Prescriptions, Inc., M.P.K., Inc., and
Sax Discount Pharmacy, Inc.,                         Case No. 17-10520

       Plaintiffs,                                 Honorable Nancy G. Edmunds

v.

Walgreen Co.,

       Defendant.

_____/

**OPINION AND ORDER DENYING IN PART AND GRANTING IN PART
DEFENDANT'S MOTION TO DISMISS [12]**

This matter is before the Court on Defendant's motion to dismiss the complaint.

(Docket 12.) Plaintiffs' complaint consists of four claims for breach of contract and one

claim for silent fraud. Plaintiffs filed a response to Defendant's motion and Defendant filed

exhibits under seal and a reply. (Dkts. 18, 19, 20, 21.) The Court heard Defendant's motion

on June 7, 2017.

## I.   FACTS

Plaintiff Warren Prescriptions, Inc. ("Warren"), operated a retail store that included a

pharmacy in Farmington Hills, Michigan (the "Farmington Hills Drugstore"). (Compl. ¶ 10.)

Plaintiff Sax Discount Pharmacy, Inc. ("Sax"), operated a pharmacy in Taylor, Michigan (the

"Taylor Drugstore"), and Plaintiff M.P.K., Inc. ("MPK") operated the front-end non-pharmacy

retail business of the Taylor Drugstore. (Compl. ¶ 11.) On or about May 1, 2014, Warren,

Sax and MPK (together, "Plaintiffs") entered into an asset purchase agreement (the "APA")

with Defendant Walgreen Co. (Compl. ¶ 8; Def.'s Mot. Ex. A-1, dkt. 19-1, filed under seal.) The APA was amended on or about July 31, 2014 by Amendment No. 1 to the Asset Purchase Agreement (the "Amendment", together, the "Agreement" or "APA"). (Compl. ¶ 9; Def.'s Mot., Ex. A-2, dkt. 19-2, filed under seal.) Defendant provided both documents under seal to the Court with its motion. Plaintiffs agree that the Agreement is referred to in the Complaint, is integral to Plaintiffs' claims, and should be considered with the instant motion. (Pls.' Resp. 1, dkt. 20.)

The sale for the two drugstores closed on or about August 6, 2014. (Compl. ¶ 19.) The parties agree that $6.7 million was paid at the closing. (Compl. ¶ 23; Def's. Br. 3.) The APA contains the following Purchase Price provision at section 4.1:

> The purchase price (the "Purchase Price") for the Purchased Assets and the covenants and agreements set forth herein shall be an amount equal to Ten Million Eight Hundred Thousand Dollars ($10,800,000.00) (the "Base Amount"), as adjusted in accordance with Sections 4.2(c) plus the Employment Bonus Payment and the Inventory Amount. The parties further agree that the Base Amount will decrease in the event there is a Material Reduction (as defined below) in the daily prescription count at the Pharmacies between the date of this Agreement and the Closing Date, which decrease shall be calculated as follows: (a) on a date within fifteen (15) days of Closing (such date the "Verification Date") the parties shall measure, using the same procedures as used in measuring the Current Volume, the average daily prescription count over a six (6) month period ending on the Verification Date at the Pharmacies (such count, the "Verification Date Volume"); and (b) in the event the Verification Date Volume is less than the Current Volume by five (5) percent or more, then such shall constitute a "Material Reduction" and the Base Amount shall be reduced by an amount to be mutually agreed upon by the parties. Buyer's calculation of the Verification Date Volume shall be conclusive absent manifest error.

(APA § 4.1; Amendment No.1 To APA, Section 3.) Prior to the closing, the two drugstores were filling an average of approximately 820 prescriptions per day. (Compl. ¶ 12, dkt. 1; APA §§ 1.1, 6.9 as amended, Ex. K, dkt. 19-1.)

Section 4.2 provides that a portion of this Base Amount would be paid out after closing and pursuant to a schedule set forth at Exhibit L, on the basis of the retention of a certain average amount of prescriptions per day; filling less than an average of 610 prescriptions per day would result in a Retention Earnout Termination as follows:

(c) An amount up to Four Million Dollars and No/100 ($4,000,000.00) of the Records Amount (the "Retention Earnout"), shall be paid pursuant to Exhibit K within thirty (30) days after the date that is the last day of the month during which the twelve (12)-month and twenty-four (24)-month anniversaries of the Closing Date falls (the "Retention Earnout Termination Dates"), by wire transfer . . . ; provided, that in the event of a Retention Earnout Termination (as defined below), Buyer will be permitted to retain any unpaid portion of the Retention Earnout, with no further obligation to Sellers. As used in this Section 4.2(c), "Retention Earnout Termination" means a determination by Buyer, based on the procedures set forth below, that the Average Customer Prescriptions is less than six hundred ten (610). On or promptly after each of the Retention Earnout Termination Dates, Buyer will identify, through its pharmacy computer system, the total number of prescriptions filled at pre-existing Walgreens drug stores and at the Premises for patients of the Pharmacies since the Closing Date (the "Customer Prescriptions"). Buyer shall then divide the Customer Prescriptions by the number of days from the Closing Date to each of the Retention Earnout Termination Dates (the "Average Customer Prescriptions"). Buyer's calculation of the Average Customer Prescriptions shall be conclusive.

(APA § 4.2(c); Compl. ¶¶ 24-27.)

On September 3, 2015, little more than one year after the Closing, Defendant sent an email to Plaintiffs' agent, stating the following:

Pursuant to the Asset Purchase Agreement dated May 1, 2014, and Amendment No. 1 to the Asset Purchase Agreement dated July 31, 2014, by and among WALGREEN CO., SAX DISCOUNT PHARMACY, INC., MPK INC. and WARREN SAV-MOR PRESCRIPTIONS, the amount of $4,000,000.00 (the 'Twelve Month Prescription Earnout') was withheld from the Purchase Price, and payable upon Sellers [sic] retaining an average of at least six hundred ten (610) prescriptions per day for the twelve (12)-month period following Closing. According to Buyer's calculations, 253 Rx/Day were retained from Sax Pharmacy and 143 Rx/Day were retained from Warren Pharmacy and Sellers did not retain the required number of prescriptions necessary for payment of the Prescription Earnout. Therefore, no full or partial payment of the Twelve Month Prescription Earnout shall be made, and Buyer shall have

no further obligations for payment.

(Compl. ¶ 28; Pls.' Resp. 2-3.) Plaintiffs' claims arise from Defendant's position that it is not obligated to pay a remaining amount of $4,000,000 to Plaintiffs. Plaintiffs bring claims for breach of contract (breach of the indemnification provisions– Count I; breach of the covenants, agreements or obligations under the Agreement– Count II; breach of the covenant of good faith and fair dealing– Count III; breach of representation– Count IV) and silent fraud (Count V).

## II. LEGAL STANDARD

Defendant brings this motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), alleging the "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Sixth Circuit noted that under the United States Supreme Court's heightened pleading standard laid out in *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), "a complaint only survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Estate of Barney v. PNC Bank, Nat'l Ass'n,* 714 F.3d 920, 924 (6th Cir. 2013) (internal quotations and citations omitted). The court in *Estate of Barney* goes on to state that under *Iqbal*, "[a] claim is plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal quotations and citations omitted). Furthermore, while the "plausibility standard is not akin to a 'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Estate of*

*Barney*, 714 F.3d at 924 (citing *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). If the plaintiffs do "not nudge[ ] their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570. Finally, the Court must keep in mind that "on a motion to dismiss, courts are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 555 (quotation and citation omitted).

"[D]ocuments attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss." *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) (citing Fed.R.Civ.P. 10(c)). "A court may consider matters of public record in deciding a motion to dismiss without converting the motion to one for summary judgment." *Id.* at 336. "In addition, when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." *Id.* at 335-36; *see also Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir.1999)(documents not attached to the pleadings may still be considered part of the pleadings when the "document is referred to in the complaint and is central to the plaintiff's claim") (internal quotation marks and citations omitted).

## III.  ANALYSIS

### A.  Whether Plaintiffs State Claims For Breach Of Contract

#### 1.  Indemnification Provision- Count I

Plaintiffs allege in Count I that in section 10.2 of the APA, Defendant contractually agreed to indemnify Plaintiffs and hold them harmless as follows:

> [F]rom and against any and all Loss and Expense incurred by any of them in connection with or arising from: (a) any breach by Buyer of any of its representations or warranties in this Agreement or in any agreement or document required to be delivered by Buyer hereunder; (b) any breach by

5

Buyer of any of its covenants, agreements or obligations in this Agreement or in any agreement or document required to be delivered by Buyer hereunder; (c) any Assumed Liability; (d) the acts or omissions of Buyer or its Affiliates, employees, agents and contractors, in connection with the transactions contemplated by this Agreement; and (e) without limiting Buyer's rights to indemnification under <u>Section 10.1</u>, the conduct or operation of the Business by Buyer or any of its Affiliates after Closing.

(APA § 10.2, Def.'s Mot. Ex. A-1; Compl. ¶ 18.)

Defendant argues that the indemnification provision protects "against loss that is extrinsic to the rights between and among the parties under the contract itself; such a clause does not operate as a catch-all that protects a party against loss where the contract provides no relief." (Def.'s Mot. Dismiss 4, dkt. 12.) Defendant relies generally on *Ray D. Baker Contractor, Inc. v. Chris Nelsen & Son, Inc.*, which pointed out that this "type of clause has traditionally been used to indemnify one of the contracting parties against tort liability to third parties." *Ray D. Baker Contractor, Inc.*, 136 N.W.2d 771, 773 (Mich. Ct. App. 1965). *Ray D. Baker Contractor* was a 1965 decision which also noted that "[i]n no case has such a clause been successfully used to protect one contracting party from liability to the other when dealing *inter se*, with no third party plaintiff concerned." *Id.*

Plaintiffs point to cases decided since then, in which the courts have held an indemnity provision applicable as between parties. For example, in *Raymond v. Bowers*, the Michigan court of appeals held that an indemnity provision in a lease contract between the defendant and the plaintiff was applicable to the defendant's negligence, allegedly the cause of the plaintiff's injury. *See Raymond v. Bowers*, 2002 WL 1308782 (Mich. Ct. App. June 11, 2002) ("we find the broad, all inclusive language of the indemnity clause a clear indicator that the parties intended to protect defendant against the type of liability that plaintiff here seeks to impose"); *see also Sherman v. Sherrod*, 2015 WL 9257954, at *8 (Mich. Ct. App.

6

Dec. 17, 2015) (The Michigan court of appeals upheld the trial court's award of attorneys' fees pursuant to an indemnification agreement after the plaintiff prevailed on its breach of contract claim. The defendants first argued that the indemnification provision did not apply because provisions such as the one at issue "are applicable to claims brought against the indemnitee by third parties, not to direct claims between the parties themselves"; the court of appeals noted that "'an indemnity contract creates a direct, primary liability between the indemnitor and the indemnitee that is original and independent of any other obligation.'") (quoting *Miller-Davis Co. v. Ahrens Constr., Inc.*, 848 N.W.2d 95 (Mich. 2014)). The fact that Plaintiffs seek to enforce the indemnification clause as between the parties, without third-party involvement, does not alone preclude Plaintiffs' claim.

The Court notes that the cases on which Plaintiffs rely are distinguishable on the issue of whether the indemnification provision gives rise to a contract claim. For example, *Raymond* is a negligence case. And while the plaintiff's success in *Sherman* was on a breach of contract claim, the indemnification clause provided the basis for an award of attorneys fees, not an independent breach of contract claim. Yet this district, in considering a Michigan Court of Appeals holding, noted that while "indemnification provisions do not generally cover contract disputes" and parties are discouraged "from using them as such if that was not the provision's intent," parties are not prohibited "from contracting for indemnification based on contract performance. In fact, Michigan law recognizes that parties can, through broad language, contract for indemnification liability beyond that arising from third-party claims if such intent can be ascertained." *Authorized Integrators Network, LLC v. Wirepath Home Systems, LLC*, No. 13-10414, 2013 WL 3179505 at *3 (E.D. Mich. June 20, 2013) (deciding not to dismiss the plaintiff's claim for indemnification)

(referring to *Miller-Davis Co. v. Ahrens Const., Inc.,* 817 N.W.2d 609, 619 (Mich. Ct. App. 2012) (rev'd in part by *Miller-Davis Co. v. Ahrens Constr., Inc.*, 848 N.W.2d 95 (Mich. 2014)).

Under Michigan law, the "primary task in construing a contract . . . is to give effect to the parties' intention at the time they entered into the contract." *Miller-Davis Co. v. Ahrens Constr., Inc.*, 848 N.W.2d 95, 102 (Mich. 2014). The parties' intent is determined "by examining the language of the contract according to its plain and ordinary meaning" and avoiding "an interpretation that would render any portion of the contract nugatory." *Id.* "Where parties have expressly contracted for indemnification, 'the extent of the duty must be determined from the language of the contract.'" *Id.*

The indemnity provision at issue is not ambiguous. First, Plaintiffs as the Sellers are among the parties Defendant agrees to indemnify and hold harmless "from and against any and all Loss and Expense" incurred by any of them . . . ." (APA § 10.2.) "'Loss' means any and all losses, costs, obligations, liabilities, settlement payments, awards, judgments, fines, penalties, damages, expenses, deficiencies or other charges." (APA § 1.1, Definitions.) "'Expenses' means any and all reasonable expenses incurred in connection with investigating, defending or asserting any claim, action, suit or proceeding incident to any matter indemnified against hereunder (including court filing fees, court costs, arbitration fees or costs, witness fees, and reasonable fees and disbursements of legal counsel, investigators, expert witnesses, accountants and other professionals)." (APA § 1.1, Definitions.)

It must be determined whether Plaintiffs' failure to obtain the payment of the deferred portion of the purchase price was a Loss under the APA. The APA definition of Loss

includes "any and all losses," and Plaintiffs rely on the Merriam-Webster dictionary in which definitions for loss include: "a person or thing or an amount that is lost," "failure to gain, win, obtain, or utilize," and "decrease in amount, magnitude or degree." MERRIAM-WEBSTER DICTIONARY. Black's Law Dictionary includes in its definition of loss "[a]n undesirable outcome of a risk; the disappearance or diminution of value, usu. in an unexpected or relatively unpredictable way." BLACK'S LAW DICTIONARY, LOSS (10th ed. 2014). Here, the provision uses the phrase "any and all Loss and Expense," and the Court of Appeals has noted in the past that the "term 'any' does not denote a precise specification or identification," and in that case, where it was used as "any persons", it "plainly does not limit the category of persons who may be affected by the indemnification provision." *Raymond v. Bowers*, 2002 WL 1308782, at *2.

As defined, the amount Plaintiffs refer to as the deferred portion of the purchase price is a decrease from a defined Base Amount. The deferred portion is like the "loss" as defined in either the Merriam-Webster (a "decrease") or Black's Law (the "diminution of value") dictionaries. The APA provides that

> The purchase price (the "Purchase Price") for the Purchased Assets and the covenants and agreements set forth herein shall be an amount equal to Ten Million Eight Hundred Thousand Dollars ($10,800,000.00) (the "Base Amount"), as adjusted in accordance with Sections 4.2(c) plus the Employment Bonus Payment and the Inventory Amount. The parties further agree that the Base Amount will decrease in the event there is a Material Reduction (as defined below) in the daily prescription count at the Pharmacies between the date of this Agreement and the Closing Date, which decrease shall be calculated as follows: (a) on a date within fifteen (15) days of Closing (such date the "Verification Date") the parties shall measure, using the same procedures as used in measuring the Current Volume, the average daily prescription count over a six (6) month period ending on the Verification Date at the Pharmacies (such count, the "Verification Date Volume"); and (b) in the event the Verification Date Volume is less than the Current Volume by five (5) percent or more, then such shall constitute a "Material Reduction" and the Base

> Amount shall be reduced by an amount to be mutually agreed upon by the parties. Buyer's calculation of the Verification Date Volume shall be conclusive absent manifest error.

(APA § 4.1; Amendment No.1 To APA, Section 3.) Despite Defendant's attempt to characterize this amount as a "bonus" instead of a loss, the plain and ordinary language of the APA shows that the amount was a diminution of the Base Amount and is not described as a "bonus" in the APA or amended APA.[1] (Def.'s Reply 2-3 "Plaintiffs cannot explain how the term 'loss' in § 10.2 encompasses their failure to receive a *bonus* under 4.2." Emphasis added. Dkt. 21).

Next, the Indemnity Provision requires that the loss have occurred in connection with or arising from one of the enumerated events set forth in section 10.2. Consistent with their complaint, Plaintiffs argue that the loss or expense they incurred was in connection with or arose from "(c) the acts or omissions of Defendant or its employees in connection with the

---

[1]    The Court notes that in *Deom v. Walgreen*, 591 Fed. Appx. 313 (6th Cir. Nov. 12, 2014), discussed in further detail below, the Sixth Circuit considered another case with the same Defendant involving the purchase of a pharmacy and characterized the case as one in which "the contract specified a condition precedent for a bonus payment to one party" and that the "seller was to receive a bonus if the buyer filled a minimum number of prescriptions for the seller's former customers within a certain period after the sale." *Id.* at 314. The *Deom* opinion does not contain the actual contract language but describes the arrangement in part as follows: the plaintiff "signed an Asset Purchase Agreement with Walgreen to sell the inventory and prescription records from his pharmacies for $3,500,000 and Walgreen's agreement to pay an additional $600,000 as an earnout bonus if it filled an average of at least 308 prescriptions daily for [the plaintiff's] former customers in the nine months after the sale." *Id.* at 314. The characterization of the agreement in *Deom* is distinguishable from the plain language here, in which the Purchase Price is defined as the Base Amount of $10,800,000.00, adjusted in accordance with section 4.2(c) (which characterizes the retention of funds as a Retention Earnout), plus the Employment Bonus Payment and the Inventory Material Reduction. (APA and Amended APA, §§ 4.1, 4.2(c).)
It is also worth noting that the APA defines the amounts to be paid to transferred employees as a "Bonus Payment," thus recognizing a distinction in the classification as a "bonus." (APA § 4.2(e).)

transactions contemplated by the Agreement; and/or (d) the conduct or operation of the business by Defendant after closing." (Pls.' Resp. 7; Compl. ¶ 35.) Both of these allegations are covered under the indemnification provision. (APA § 10.2.)

Plaintiffs make specific allegations of the acts or omissions of Defendant that constituted improper conduct or operation of the drugstores after closing, or acts or omissions made by Defendant in connection with acts contemplated by the APA. These include:

> (a) [N]ot answering phone calls from customers of the Two Drugstores; (b) not being coordinated with third party payors, . . . , which resulted in customer dissatisfaction, long lines at the Two Drugstores, and an inability to timely fill full prescriptions; (c) inadequately staffing the number of employees who ran the pharmacies at the Two Drugstores (including a failure to staff so that the Business after Closing was conducted in substantially the same manner as the Business was conducted prior to Closing); (d) failing to maintain sufficient inventory of drugs at the pharmacies at the Two Drugstores (including a failure to maintain inventories so that the Business after Closing was conducted in substantially the same manner as the Business was conducted prior to Closing); and (e) discontinuing lottery sales at the Two Drugstores, which resulted in a reduction in the number of customers at the pharmacies located within the Two Drugstores.

(Compl. ¶ 36.) Following Plaintiffs' argument, the indemnification provision is broad enough to cover liability between the indemnitor and indemnitee for these alleged acts without any third-party claim or obligation.

Defendant also argues that under the payment structure set forth in the APA, which contemplates that prescriptions may fall below a specific level, below which Plaintiffs would not be entitled to the Retention Earnout payment, an interpretation of the indemnification provision that requires Defendant to indemnify against the possibility of lower prescriptions would effectively nullify section 4.2 of the APA. The Court must avoid "an interpretation that would render any portion of the contract nugatory." *Miller-Davis Co.*, 848 N.W.2d at 102.

Defendant argues that the result would be that Plaintiffs would receive payments whether prescriptions met the Average Customer Prescriptions requirement of at least 610 or whether prescription levels fell below 610. This argument ignores the requirement in section 10.2 that the Loss and Expense arise from "the conduct or operation of the Business by Buyer or any of its Affiliates after Closing" and, as set forth below, Plaintiffs have specifically alleged conduct by Defendant in operating the business which would have resulted in a loss of customers and prescriptions. For this reason, the Court denies Defendant's motion to dismiss as to Plaintiff's Count I, breach of contract predicated upon the indemnification provision.

## 2. Covenant, Obligation, Agreement - Count II

Next, Defendant argues that Plaintiffs' claim that Walgreen breached section 8.15 of the APA must fail because section 8.15 places a duty on the sellers– Plaintiffs– and not the purchaser– Defendant. (Def.'s Br. 6.). Section 8.15 provides:

> 8.15. <u>Avoiding Abandonment of Business and Patients</u>. Sellers shall reasonably cooperate with Buyer as deemed necessary by Buyer to enable Buyer to conduct the Business after Closing in substantially the same manner as the Business is being currently operated without loss of patient information and without interruption of service to patients or Payment Programs, billing or collection, or other material aspect of the Business. . . . .

(Compl. ¶ 14; APA § 8.15.) Plaintiffs claim that "Defendant breached the Agreement by failing to cooperate as may be reasonably necessary to enable Defendant to (i) transition all acquired patient files and other confidential information to Defendant, and (ii) obtain all required Medicare or Medicaid authorizations or numbers, NCPDP numbers and DEA authorizations, permits or licenses." (Compl. ¶ 38; see also APA § 8.15 (b).)

The plain language of APA section 8.15 places a duty on Sellers/Plaintiffs, not

Buyer/Defendant. Plaintiffs rely on section 8.15 to argue that the intent of the parties was that Defendant would continue to run the Two Drugstores in "substantially the same manner" after the Closing. (Resp. 11-12.) In paragraph 39 of the complaint, Plaintiffs allege that Defendant failed "to conduct the Business after Closing in substantially the same manner as the Business was operated prior to Closing without loss of patient information and without interruption of service to patients or Payment Programs, billing or collection, or other material aspect (sic) of the business." (Compl. ¶ 39; Resp. 12.)

The Court cannot find that a term requiring Defendant to operate the pharmacies in "substantially the same manner" is necessarily involved in the contractual relationship and that the parties so intended such a provision. There is no allegation, nor support in the APA to indicate that Defendant intended to limit itself to operating the pharmacies in "substantially the same manner" as they had been operated prior to Closing, as opposed to operating them in the manner of Walgreen Co., or some other equally successful, albeit different, manner. Plaintiffs have not shown that the APA is ambiguous or missing language such that additional terms must be implied. *See Stryker Corp. v. National Union Fire Ins. Co.*, 842 F.3d 422, 426-27 (6th Cir. 2016). Further, Plaintiff's claim for breach of the covenant of good faith and fair dealing addresses what appears to be central to Plaintiff's claim in Count II, that "when liability under a contract depends upon the performance or happening of a condition the promisor cannot avoid liability by preventing the condition from happening." *Stark v. Budwarker, Inc.*, 181 N.W.2d 298, 301 (Mich. Ct. App. 1970). Plaintiffs have failed to plead a claim for breach of contract in Count II sufficient to withstand Defendant's motion to dismiss.

### 3. Representation - Count IV

In Count IV, Plaintiffs allege that Defendant breached APA, section 7.2, Representation and Warranties of Buyer:

> 7.2. <u>No Conflicts</u>. The execution, delivery and performance of this Agreement by Buyer does not and will not constitute a breach of any contract to which it is a party, the effect of which breach could reasonably be expected to have an adverse effect on Buyer's ability to consummate the transactions contemplated by this Agreement.

(APA § 7.2; Compl. ¶ 13.) Plaintiffs allege that Defendant did not inform them that it had entered into a Settlement Agreement with the United States Department of Justice ("DOJ") and the United States Drug Enforcement Administration ("DEA") in which Defendant acknowledged that certain of its retail pharmacies did on some occasions dispense certain controlled substances in a manner not fully consistent with federal regulations. (Compl. ¶¶ 53, 54.) Pursuant to the Settlement Agreement, Defendant agreed to pay $80,000,000.00 to the United States and was further required to operate pursuant to a compliance program. (Compl. ¶¶ 55, 58.)

Defendant argues that "Plaintiffs do not allege that executing and performing under the APA 'constitute[d] a breach' of the settlement agreement" and that they "do not explain how such breach (if it had occurred) could 'reasonably be expected to have an adverse effect on [Walgreen]'s ability to consummate the transactions contemplated by this Agreement.'" (Def.'s Br. 7.)

Plaintiffs specifically allege that Defendant is a party to the Settlement Agreement with the DOJ and DEA. (Compl. ¶ 53.) Plaintiffs' allegations are based on the compliance program portion of the Settlement Agreement, which placed further restrictions on the two drugstores that did not exist prior to Closing. (Compl. ¶ 58.) Plaintiffs allege that these restrictions caused the pharmacies at the two drugstores to lose customers and fill

14

prescriptions at a lower rate than they were filled prior to the Closing. (Compl. ¶ 59.) Plaintiffs allege that in order for Defendant to "fully perform the Agreement (including the payment of the Deferred Portion of the Purchase Price) Defendant would have had to retain an average of 810 prescriptions per day and, to do so, Defendant would have had to breach the compliance program set forth in the Settlement Agreement." (Compl. ¶ 60.)

While these allegations raise a possibility of Defendant being party to an undisclosed contract which would hinder Defendant's performance under the APA, Plaintiff's allegations lack the factual content from which the Court could "infer more than the mere possibility of misconduct." Defendant's motion to dismiss as to Count IV will be granted and the claim will be dismissed without prejudice. Plaintiffs may amend their complaint as to Count IV.

### B. Whether Plaintiffs State a Claim For Breach Of The Implied Covenant Of Good Faith And Fair Dealing - Count III

Defendant argues that Plaintiffs fail to state a claim for breach of the implied covenant of good faith and fair dealing. Defendant relies on this Court's decision in *Albrecht v. Mortgage Electronic Registration Systems, Inc.,* 14-13834, 2015 WL 477828 (E.D. Mich. Feb. 5, 2015), to argue that the absence of any contract term creating a duty means "'there is no 'manner of performance' to evaluate, and thus no claim concerning the breach of good faith and fair dealing." *Albrecht*, 2015 WL 477828, at *4. Defendant's argument ignores the distinction between *Albrecht* and the facts in this case.

In *Albrecht*, the plaintiff advanced a claim that the defendant breached an implied duty of good faith and fair dealing by denying the plaintiff's request for "loss mitigation assistance as an alternative to foreclosure." *Id.* at *4. The Court pointed out that the only binding contracts between the parties did not contain any "provision requiring the Trustee

to engage in any level of 'loss mitigation assistance.'" *Id.*; *see also Phillips v. Green Tree Servicing LLC*, 15-13582, 2016 WL 627903 (E.D. Mich. Feb. 17, 2016) ("Plaintiff cannot state a claim for breach of an implied covenant of good faith where the parties have expressed their respective rights in a written agreement, that being the mortgage in this case. There is no dispute that plaintiff's mortgage does not require defendant to engage in loss mitigation assistance."). The Court also noted that the plaintiff was "correct in his assertion that a duty might exist where 'a party to the contract makes the manner of its performance a matter of its own discretion.'" *Id.* Here, unlike *Albrecht*, Plaintiffs do not allege that the covenant of good faith and fair dealing creates a duty not otherwise contemplated by the APA. The APA specifically contemplates an obligation contingent on a condition: the payment of the deferred portion of the purchase price upon the maintenance of a specific number of prescriptions filled each day.

"Michigan recognizes that in every contract in which performance is left to a party's discretion, such discretion must be exercised honestly and in good faith." *Bolone v. Wells Fargo Home Mortg., Inc.*, 858 F. Supp. 2d 825, 834 (E.D. Mich. 2012); *see also Burkhardt v. City Nat'l Bank of Detroit*, 226 N.W.2d 678, 680 (Mich. Ct. App.1975) ("Where a party to a contract makes the manner of its performance a matter of its own discretion, the law does not hesitate to imply the proviso that such discretion be exercised honestly and in good faith."); *Lowe's Home Centers, Inc. v. LL & 127, LLC*, 147 Fed. Appx. 516, 523–24 (6th Cir. 2005) ("[W]here the manner of performance under a contract is left to the discretion of a party, that party may breach the contract by exercising its discretion in bad faith."). As Plaintiffs point out, the Sixth Circuit in *Deom v. Walgreen Co.* already found that where a defendant has "contractual discretion over the quality and quantity of service it provided its

existing customers and [the plaintiff's] former customers, even though other factors clearly influenced the number of prescriptions [the defendant] filled," the defendant Walgreen's "discretion over how it served customers' prescription needs was limited by the implied covenant of good faith and fair dealing." *Deom*, 591 Fed. Appx. at 316-17.

As discussed above, in *Deom*, the Sixth Circuit considered a different case in which Walgreen Co. was a defendant. *Supra* n.1. Deom entered into an APA with Walgreen, which the Sixth Circuit described as the plaintiff's agreement to "sell the inventory and prescription records from his pharmacies for $3,500,000 and Walgreen's agreement to pay an additional $600,000 as an earnout bonus if it filled an average of at least 308 prescriptions daily for Deom's former customers in the nine months after the sale." *Id.* at 314. "If Walgreen filled more than 308 prescriptions daily, Deom could earn a larger bonus, up to $800,000." *Id.* As here, Walgreen filled "fewer than the number of prescriptions needed to trigger the earnout bonus." *Id.* The plaintiff sued, "alleging that Walgreen had either lied about how many prescriptions it filled or breached the implied duty of good faith and fair dealing by failing to be 'adequately prepared' to serve [the plaintiff's] former customers after the sale," and alleging that Walgreen provided "substandard customer service" including "'unhelpful staff' and 'long waiting times.'" *Id.* at 314-15.

The Sixth Circuit noted that a "party has contractual discretion over an obligation that is 'contingent upon a condition particularly within the power of that party.'" *Id.* at 316. Contractual discretion can be present when a party has "sufficient control to be able to prevent the condition from occurring." *Id.* The Sixth Circuit noted that when "an earnout clause makes a seller's bonus contingent on postsale business success, a buyer may have contractual discretion in how it runs the business so as to meet the target amount to trigger

17

the earnout bonus." *Id.* The court noted that it could not find "as a matter of law that the implied duty claim fails for lack of Walgreen's contractual discretion over how it responded to the foreseeable increased staff and time needed to serve these customers." *Id.* at 316-17. Plaintiff's claim ultimately failed because "Illinois law requires allegations that Walgreen acted in bad faith, not just unreasonably or negligently. . . . A plaintiff generally must plead improper motive to state a claim for breach of the implied covenant." *Id.* at 317.

Deom turned on the plaintiff's failure to plead bad faith, a requirement under Illinois law. Here, Plaintiffs allege that "the amount of Defendant's lost profits from a reduction of the Average Customer Prescriptions from 810 to 609 during the First Twelve Month Period was less than the $4 million Defendant would be permitted to retain from the Deferred Portion of the Purchase Price as a result of such a reduction in the Average Customer Prescriptions" and that Defendant acted in bad faith and with improper motive by running the pharmacies in a substandard manner during the relevant time period. (Compl. ¶¶ 48, 49.)

In this instance, Plaintiffs have stated a claim for a breach of the implied covenant of good faith and fair dealing. The Court will deny Defendant's motion to dismiss as to Count III.

## C.    Whether Plaintiffs State a Claim For Silent Fraud - Count V

In Count V, Plaintiffs allege silent fraud. Defendant argues that Plaintiffs' silent fraud claim is barred by the APA's integration clause and the economic-loss doctrine and that it fails to meet Fed. R. Civ. P. 9(b)'s heightened pleading standard.

> The elements of silent fraud are: (1) the defendant failed to disclose a material fact about the subject matter at issue; (2) the defendant had actual knowledge of the fact; (3) the failure to disclose the fact gave the plaintiff a

false impression; (4) when the defendant failed to disclose the fact, he or she knew that the failure to disclose would create a false impression; (5) when the defendant failed to disclose the fact, he or she intended that the plaintiff rely on the resulting false impression; (6) the plaintiff indeed relied on the false impression; and (7) the plaintiff suffered damages resulting from his or her reliance.

*City of Dearborn v. Burton-Katzman Dev. Co.*, 2014 WL 7212895, at *10 (Mich. Ct. App. Dec. 18, 2014) (citing *Hord v. Envtl. Research Inst. of Michigan*, 579 N.W.2d 133 (Mich. Ct. App. 1998)).

Defendant relies on *Hamade v. Sunoco, Inc.,* and *UAW-GM Human Resource Center v. KSL Recreation Corp.*, for the premise that under Michigan law, an integration clause bars fraud claims unless the alleged fraud invalidates the integration clause itself. *See Hamade v. Sunoco Inc.*, 721 N.W.2d 233, 249 (Mich. Ct. App. 2006) ("when a contract contains a valid merger clause, the only fraud that could vitiate the contract is fraud that would invalidate the merger clause itself, i.e., fraud relating to the merger clause or fraud that invalidates the entire contract including the merger clause); *UAW-GM Human Res. Ctr. v. KSL Recreation Corp.*, 579 N.W.2d 411, 419 (Mich. Ct. App. 1998). The APA contains an integration clause at section 13.5, providing in part that "[t]his Agreement and the Exhibits and Schedules referred to herein and the documents delivered pursuant hereto contain the entire understanding of the parties hereto with regard to the subject matter contained herein, . . . and supersede all prior agreements, . . . ." (APA § 13.5.)

According to Plaintiffs, this argument does not take into account a distinction between information suppressed in the making of the contract versus a contractual term. Plaintiffs alleged that at the time the APA was executed, Defendant had actual knowledge of material facts, including Defendant's compliance program obligations pursuant to Defendant's

Settlement Agreement with DOJ and DEA, which it did not disclose to Plaintiffs.[2] This is a relevant distinction. Plaintiffs allege that by such failure to disclose, they were given a false impression that there would not be a meaningful reduction in the number of Average Customer Prescriptions after the Closing. (Compl. ¶¶ 64-66.)

> [T]here is an important distinction between (a) representations of fact made by one party to another to induce that party to enter into a contract, and (b) collateral agreements or understandings between two parties that are not expressed in a written contract. It is only the latter that are eviscerated by a merger clause, even if such were the product of misrepresentation.

*LIAC, Inc. v. Founders Ins. Co.*, 222 Fed. Appx. 488, 493 (6th Cir. 2007)(quoting *Star Ins. Co. v. United Commercial Ins. Agency, Inc.*, 392 F. Supp. 2d 927, 929-30 (E.D. Mich. 2005)).

> Silent fraud . . . involves information that has been deliberately and deceptively withheld by one of the contracting parties. Undisclosed material facts that were never the subjects of precontractual negotiations are not absorbed by a contract. A contrary ruling would immunize from liability a contracting party who suppressed information that it was duty-bound to include in the parties' discussions.

*Abbo v. Wireless Toyz Franchise, L.L.C.*, 2014 WL 1978185, at *5 (Mich. Ct. App. May 13, 2014). In *Abbo*, the Michigan Court of Appeals considered the language of the merger agreements, noting that they applied to "any and all prior or contemporaneous agreements, whether oral, written, express or implied, between the parties with respect to the subject matter" and "all previous written and oral agreements or understandings between the

---

[2] Other alleged material facts include that "(a) as of the Closing of the Agreement, Defendant having failed to obtain all required Medicare or Medicaid authorizations or numbers, or NCPDP or NABP numbers; (b) Defendant's intent to not maintain sufficient inventories at the pharmacies at the Two Drugstores in order to meet customer/patient needs; (c) Defendant's intent to operate the pharmacies at the Two Drugstores without sufficient staff to meet customer/patient needs; (d) Defendant's intent to eliminate lottery sales at the Two Drugstores . . . ." (Compl. ¶ 64.)

parties," noting that it would "enforce this unambiguous contractual language according to its plain terms." *Id.* at *6. The court also noted that neither of the merger clauses at issue made "reference to prior 'representations' or 'inducements.'" *Id.* The court concluded that "they did not preclude the admission of factual representations regarding matters unaddressed by the contract." *Id.*

Similarly, the merger clause at issue supercedes "all prior agreements, understandings or letters of intent" and its plain language does not preclude the admission of parol evidence that Defendant fraudulently concealed the Settlement Agreement with DOJ and DEA. Unlike those cases on which Defendant relies, Plaintiffs do not allege an agreement collateral to the APA. *See Hamade*, 721 N.W.2d at 249 (agreement contained a merger clause; the plaintiff elected to forgo a term that would have given him an exclusive territory on the basis of the defendant's alleged representation, and the plaintiff knew the term was not included in the agreement when he signed it; the plaintiff's "only claim on appeal is that he was led to believe that he did not need such a clause"); *UAW-GM Human Resource Center*, 579 N.W.2d at 419 ("fraud that relates solely to an oral agreement that was nullified by a valid merger clause would have no effect on the validity of the contract"). Instead, Plaintiffs allege that the failure to disclose material facts prior to executing the APA gave Plaintiffs a false impression "that there would not be a meaningful reduction in the number of Average Customer Prescriptions after the Closing." (Compl. ¶ 66.)

> [A] party could still justifiably rely upon representations made by another party regarding things outside the scope of the contractual terms, such as the other party's solvency, indebtedness, experience, clientele, client retention rate, business structure, etc. If these representations are false when they are made, not merely opinion and not future promises, they could constitute fraud in the inducement.

*Star Ins. Co.,* 392 F. Supp. 2d at 930 (citing *Kamalnath v. Mercy Memorial Hosp. Corp.*, 487 N.W.2d 499 (Mich. Ct. App. 1992)). The inclusion of the integration clause does not bar Plaintiffs' fraud claims as plead.

Next, Defendant argues that the silent fraud claim is barred by the economic loss doctrine. "Generally, under Michigan law, a plaintiff '[may] not maintain an action in tort for nonperformance of a contract.'" *DBI Investments, LLC v. Blavin*, 617 F. Appx. 374, 381 (6th Cir. 2015) (quoting *Ferrett v. Gen. Motors Corp.*, 475 N.W.2d 243, 247 (Mich. 1991)). A tort claim is available where it is "extraneous to the contractual dispute." *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.,* 532 N.W.2d 541, 545 (Mich. Ct. App. 1995). Defendant argues that the damages Plaintiffs claim are wholly interwoven with the terms of the APA and Plaintiffs' agreement to a prescription-based compensation structure. (Def.'s Br. 10.) Yet *DBI* also recognized that in Michigan, fraudulent inducement is an exception to the economic loss doctrine, where, as alleged here, it is extraneous to the contract. Here, the alleged suppression of information relating to the Settlement Agreement occurred prior to the execution of the APA and Plaintiffs specifically allege that Defendant intended Plaintiffs rely on the false impression given by the suppression of certain information, and that Plaintiffs did so. (Compl. ¶ 66-69). Therefore, this claim is not barred by the economic loss doctrine.

Finally, Defendant argues that Plaintiffs have not plead their fraud claim sufficiently to meet the standards of Fed. R. Civ. P. 9(b), which requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Under Rule 9, Plaintiffs must "allege the time, place, and

content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 563 (6th Cir. 2003). As discussed at the hearing, Plaintiffs have not alleged with the necessary particularity the bases of their silent fraud claim(s), and as set forth above with respect to Count IV, Plaintiffs must amend Count V to allege facts related to the Settlement Agreement and other fraud allegations with enough specificity to allow the Court to do more than infer "the mere possibility of misconduct." Count V will be dismissed without prejudice.

## IV. CONCLUSION

For the reasons set forth above the Court GRANTS Defendant's motion to dismiss (dkt. 12) without prejudice as to Counts IV and V, GRANTS Defendant's motion as to Count II, and DENIES Defendant's motion to dismiss as to the remaining Counts I and III. Plaintiffs have 21 days from entry of this opinion and order to file an Amended Complaint as to Counts IV and V.


**SO ORDERED.**

 s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge


Dated:  August 4, 2017

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 4, 2017, by electronic and/or ordinary mail.

 s/Carol J. Bethel
Case Manager