UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Warren Prescriptions, Inc., M.P.K., Inc., and
Sax Discount Pharmacy, Inc.,

        Plaintiffs,

v.

Walgreen Co.,

        Defendant.

_____/

Case No. 17-10520

Honorable Nancy G. Edmunds


**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION TO DISMISS COUNTS IV AND V OF THE AMENDED
COMPLAINT AND TO EXTEND TIME FOR ANSWERING THE REMAINING COUNTS
[28]**


      This matter is before the Court on Defendant's motion to dismiss counts IV and V of

the amended complaint and to extend time for answering the remaining counts. (Docket

28.) On August 4, 2017, the Court issued an opinion and order (dkt. 23) denying in part and

granting in part Defendant's motion to dismiss Plaintiffs' original complaint, which consisted

of four claims for breach of contract (counts I-IV) and one claim for silent fraud (count V).

At that time, the Court denied Defendant's motion to dismiss as to counts I (breach of

indemnification provisions) and III (breach of the covenant of good faith and fair dealing).

The Court granted Defendant's motion to dismiss with respect to count II (breach of the

covenants, agreements and obligations under the Agreement) and dismissed it with

prejudice. Finally, the Court granted Defendant's motion and dismissed without prejudice

counts IV (breach of representations) and V (silent fraud). Plaintiffs filed a first amended

complaint as to counts IV and V (dkt. 34) and Defendant again seeks to dismiss those counts. The Court heard this matter on November 1, 2017.

## I. FACTS

The facts, as set forth in the Court's prior order, are as follows. Plaintiff Warren Prescriptions, Inc. ("Warren"), operated a retail store that included a pharmacy in Farmington Hills, Michigan (the "Farmington Hills Drugstore"). (Am. Compl. ¶ 10.) Plaintiff Sax Discount Pharmacy, Inc. ("Sax"), operated a pharmacy in Taylor, Michigan (the "Taylor Drugstore"), and Plaintiff M.P.K., Inc. ("MPK") operated the front-end non-pharmacy retail business of the Taylor Drugstore (the Taylor Drugstore and Farmington Hills Drugstore together, the "Pharmacies"). (Am. Compl. ¶ 11.) On or about May 1, 2014, Warren, Sax and MPK (together, "Plaintiffs") entered into an asset purchase agreement (the "APA") with Defendant Walgreen Co. (Am. Compl. ¶ 8; Def.'s Mot. Ex. A-1, dkt. 19-1, filed under seal.) The APA was amended on or about July 31, 2014 by Amendment No. 1 to the Asset Purchase Agreement (the "Amendment", together, the "Agreement" or "APA"). (Am. Compl. ¶ 9; Def.'s Mot., Ex. A-2, dkt. 19-2, filed under seal.) Defendant provided both documents under seal to the Court with its first motion to dismiss. Plaintiffs agree that the APA is referred to in the Complaint, is integral to Plaintiffs' claims, and should be considered with the instant motion. (Pls.' Resp. 1, dkt. 20.)

The sale for the two drugstores closed on or about August 6, 2014 (the "Closing"). (Am. Compl. ¶ 19.) The parties agree that $6.7 million was paid at the Closing. (Am. Compl. ¶ 23; Def.'s Br. 3.) The APA contains the following Purchase Price provision at section 4.1:

> The purchase price (the "Purchase Price") for the Purchased Assets and the covenants and agreements set forth herein shall be an amount equal to Ten Million Eight Hundred Thousand Dollars ($10,800,000.00) (the "Base Amount"),

2

as adjusted in accordance with <u>Sections 4.2(c)</u> plus the Employment Bonus Payment and the Inventory Amount. The parties further agree that the Base Amount will decrease in the event there is a Material Reduction (as defined below) in the daily prescription count at the Pharmacies between the date of this Agreement and the Closing Date, which decrease shall be calculated as follows: (a) on a date within fifteen (15) days of Closing (such date the "<u>Verification Date</u>") the parties shall measure, using the same procedures as used in measuring the Current Volume, the average daily prescription count over a six (6) month period ending on the Verification Date at the Pharmacies (such count, the "<u>Verification Date Volume</u>"); and (b) in the event the Verification Date Volume is less than the Current Volume by five (5) percent or more, then such shall constitute a "Material Reduction" and the Base Amount shall be reduced by an amount to be mutually agreed upon by the parties. Buyer's calculation of the Verification Date Volume shall be conclusive absent manifest error.

(APA § 4.1; Amendment No.1 To APA, Section 3.) Prior to the closing, the two drugstores were filling an average of approximately 820 prescriptions per day. (Am. Compl. ¶ 12, dkt. 1; APA §§ 1.1, 6.9 as amended, Ex. K, dkt. 19-1.)

Section 4.2 provides that a portion of this Base Amount would be paid out after closing and pursuant to a schedule set forth at Exhibit L, on the basis of the retention of a certain average amount of prescriptions per day; filling less than an average of 610 prescriptions per day would result in a Retention Earnout Termination as follows:

(c) An amount up to Four Million Dollars and No/100 ($4,000,000.00) of the Records Amount (the "<u>Retention Earnout</u>"), shall be paid pursuant to <u>Exhibit K</u> within thirty (30) days after the date that is the last day of the month during which the twelve (12)-month and twenty-four (24)-month anniversaries of the Closing Date falls (the "<u>Retention Earnout Termination Dates</u>"), by wire transfer . . . ; provided, that in the event of a Retention Earnout Termination (as defined below), Buyer will be permitted to retain any unpaid portion of the Retention Earnout, with no further obligation to Sellers. As used in this <u>Section 4.2(c)</u>, "<u>Retention Earnout Termination</u>" means a determination by Buyer, based on the procedures set forth below, that the Average Customer Prescriptions is less than six hundred ten (610). On or promptly after each of the Retention Earnout Termination Dates, Buyer will identify, through its pharmacy computer system, the total number of prescriptions filled at pre-existing Walgreens drug stores and at the Premises for patients of the Pharmacies since the Closing Date (the "<u>Customer Prescriptions</u>"). Buyer shall then divide the Customer

3

Prescriptions by the number of days from the Closing Date to each of the Retention Earnout Termination Dates (the "<u>Average Customer Prescriptions</u>"). Buyer's calculation of the Average Customer Prescriptions shall be conclusive.

(APA § 4.2(c); Am. Compl. ¶¶ 24-27.)

On September 3, 2015, little more than one year after the Closing, Defendant sent an email to Plaintiffs' agent, stating the following:

> Pursuant to the Asset Purchase Agreement dated May 1, 2014, and Amendment No. 1 to the Asset Purchase Agreement dated July 31, 2014, by and among WALGREEN CO., SAX DISCOUNT PHARMACY, INC., MPK INC. and WARREN SAV-MOR PRESCRIPTIONS, the amount of $4,000,000.00 (the 'Twelve Month Prescription Earnout') was withheld from the Purchase Price, and payable upon Sellers [sic] retaining an average of at least six hundred ten (610) prescriptions per day for the twelve (12)-month period following Closing. According to Buyer's calculations, 253 Rx/Day were retained from Sax Pharmacy and 143 Rx/Day were retained from Warren Pharmacy and Sellers did not retain the required number of prescriptions necessary for payment of the Prescription Earnout. Therefore, no full or partial payment of the Twelve Month Prescription Earnout shall be made, and Buyer shall have no further obligations for payment.

(Am. Compl. ¶ 28; Pls.' Resp. 2-3.) Plaintiffs' claims arise from Defendant's position that it is not obligated to pay a remaining amount of $4,000,000 to Plaintiffs. Plaintiffs bring claims for breach of contract (breach of the indemnification provisions– Count I); breach of the covenant of good faith and fair dealing (Count III); breach of representation (Count IV) and silent fraud (Count V). (Dkt. 34.)

## II. LEGAL STANDARD

Defendant brings this motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), alleging the "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Sixth Circuit noted that under the United States Supreme Court's heightened pleading standard laid out in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), "a complaint only survives a motion to dismiss if it contains

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Estate of Barney v. PNC Bank, Nat'l Ass'n,* 714 F.3d 920, 924 (6th Cir. 2013) (internal quotations and citations omitted). The court in *Estate of Barney* goes on to state that under *Iqbal*, "[a] claim is plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal quotations and citations omitted). Furthermore, while the "plausibility standard is not akin to a 'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Estate of Barney*, 714 F.3d at 924 (citing *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). If the plaintiffs do "not nudge[ ] their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570. Finally, the Court must keep in mind that "on a motion to dismiss, courts are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 555 (quotation and citation omitted).

"[D]ocuments attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss." *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) (citing Fed.R.Civ.P. 10(c)). "A court may consider matters of public record in deciding a motion to dismiss without converting the motion to one for summary judgment." *Id.* at 336. "In addition, when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." *Id.* at 335-36; *see also Greenberg v. Life Ins.*

*Co. of Va.*, 177 F.3d 507, 514 (6th Cir.1999)(documents not attached to the pleadings may still be considered part of the pleadings when the "document is referred to in the complaint and is central to the plaintiff's claim") (internal quotation marks and citations omitted).

## III.  ANALYSIS

### A.  Whether Plaintiffs State A Claim For Breach of Contract Predicated Upon Defendant's Breach Of The Representation - Count IV

In Count IV, Plaintiffs allege that Defendant breached APA, section 7.2, Representations and Warranties of Buyer:

> 7.2. <u>No Conflicts</u>. The execution, delivery and performance of this Agreement by Buyer does not and will not constitute a breach of any contract to which it is a party, the effect of which breach could reasonably be expected to have an adverse effect on Buyer's ability to consummate the transactions contemplated by this Agreement.

(APA § 7.2; Am. Compl. ¶¶ 13, 81.) Plaintiffs allege that Defendant did not inform them that it had entered into a Settlement Agreement with the United States Department of Justice ("DOJ") and the United States Drug Enforcement Administration ("DEA") in which Defendant acknowledged that certain of its retail Pharmacies did on some occasions dispense certain controlled substances in a manner not fully consistent with federal regulations. (Am. Compl. ¶¶ 53-55.) Plaintiffs allege that pursuant to the Settlement Agreement, Defendant was required to operate pursuant to a compliance program, the obligations or restrictions of which caused the pharmacies to lose customers and to not fill prescriptions at the rate at which prescriptions were filled prior to Closing. (Am. Compl. ¶ 56, 74.) This is one of the two counts which the Court dismissed without prejudice in its August 4, 2017 opinion and order. (Dkt. 23.) The Court found that while these allegations raised a possibility of Defendant being party to an undisclosed contract which would hinder

Defendant's performance under the APA, Plaintiffs' allegations lacked the factual content from which the Court could "infer more than the mere possibility of misconduct," and the Court allowed Plaintiffs to amend the claim. It is this amended claim which Defendant now seeks to dismiss.

Defendant summarizes Plaintiffs' claim as follows: " . . . Walgreens violated this provision [7.2] because it had entered into a Settlement Agreement with the federal government and could not have achieved the prescription count necessary to entitle Plaintiffs to the Retention Earnout without breaching that Agreement." (Def.'s Mem. in Support of Mot. Dismiss 4.) Plaintiffs response is "Yes, exactly." (Pl.s' Resp. 7.)

According to Plaintiffs, "[t]he performance of the Agreement by Defendant included the payment of the Deferred Portion of the Purchase Price." (Am. Compl. ¶¶ 25, 75.) Yet the performance or duty of payment by Defendant to Plaintiffs of a portion or all of the Retention Earnout (the Deferred Portion of the Purchase Price) is not automatic; it is conditioned upon the filling of 610 or more Average Customer Prescriptions after the Closing Date, with payment amounts to be calculated pursuant to APA section 4.2 and Ex. L. (APA 4.2; Am. APA Ex. L.) Plaintiffs allege facts to support a finding that Defendant (and the Pharmacies after the Closing) were subject to additional restrictions that "caused the [P]harmacies . . . to lose customers/patients and to not fill prescriptions at the rate filled prior to the Closing." (Am. Compl. ¶ 74.) Plaintiffs allege:

> 76. In order to so perform the Agreement, Defendant would need to continue selling controlled substances at the pharmacies at the Two Drugstores in a manner similar to the way controlled substances were sold at the pharmacies at the Two Drugstores prior to the Closing (i.e., subject to compliance restrictions imposed by applicable law -- but not subject to the additional compliance restrictions imposed pursuant to the Settlement Agreement).

77. If Defendant continued to sell controlled substances in a similar manner as the pharmacies at the Two Drugstores had been operated prior to the Closing, such would have been a breach of the Settlement Agreement, because Defendant could not operate the pharmacies at the Two Drugstores in such a manner because it was subject to the restrictions contained in the Settlement Agreement and Walgreen Compliance Obligations.

(Am. Compl. ¶¶ 76-77.) In the amended complaint, Plaintiffs now allege specific details about the additional steps that Defendant must take in filling prescriptions for controlled substances. The procedure includes the pharmacist engaging in Four Mandatory Steps (ranging from reviewing drug history maintained by a state Prescription Drug Monitoring Program, to answering seven questions designed to elicit red flags of potential prescription drug abuse). (Am. Compl. ¶¶ 68-70.) The pharmacist then determines whether to call a prescribing doctor to ask more questions. (Am. Compl. ¶¶ 71-72.) The term of the Settlement Agreement, including the compliance program obligations, was for three years and included approximately twenty-two months following the Closing. (Am. Compl. ¶¶ 57, 60.) Plaintiffs allege that such restrictions, among others, caused the Pharmacies to lose customers/patients and to fill fewer prescriptions. (Am. Compl. ¶¶ 73-74.)

Defendant's first argument, that Plaintiffs "failed to plead facts showing that the 'performance of [the APA]' by Walgreens 'constitute[d] a breach of' the settlement agreement" and that Plaintiffs do not attempt to allege that Walgreen's breached the Settlement Agreement, is its strongest. (Def.'s Mem. 4.) At the heart of Defendant's argument is its position that the APA does not obligate Defendant to operate the Pharmacies in any particular manner after closing.[1] (Def.'s Reply 3.)

_____

[1] The Court agrees that neither party has identified an APA provision requiring the pharmacies to be operated in a substantially similar manner to that in which they were operated prior to Closing. Yet Defendant is not completely without limitations on its

In the amended complaint, Plaintiffs included details about the procedures to which Defendant and the Pharmacies were subject under the Settlement Agreement, yet Plaintiffs have not plead facts to support a finding that Defendant's performance pursuant to the APA, including the conditional duty to pay the retention earnout, or the condition upon which it is based (filling at least 610 prescriptions, and, optimally, 810), breached or would have constituted a breach of the Settlement Agreement. Plaintiffs cited in detail the Compliance Program and Defendant's resultant Good Faith Dispensing Policy checklist, including a list of questions to the patient/client requiring possible follow-up with the prescribing doctor, yet the amended complaint does not correct the deficiency in Plaintiffs' claim for breach of the Representation at APA section 7.2. (Am. Compl. ¶¶ 66-72.) Plaintiffs allege that in order to perform under the APA, "Defendant would need to continue selling controlled substances at the pharmacies . . . in a manner similar to the way controlled substances were sold at the pharmacies . . . prior to the Closing." (Am. Compl. ¶ 76.) Despite concluding that Defendant "implicitly agreed to: 'conduct the Business after Closing

_____

performance under the APA; in the August 2017 opinion and order, the Court denied Defendant's motion to dismiss Plaintiffs' claim for breach of good faith and fair dealing. One of the transactions contemplated by the APA was that Defendant would pay to Plaintiffs the Retention Earnout of up to $4,000,000, pursuant to Exhibit L of the APA, as long as Average Customer Prescriptions were not less than 610 at the Retention Earnout Termination date 12 months following closing. (APA 4.2.) The only party to the APA with discretion to affect the happening of this occurrence after the Closing is Defendant. "Where a party to a contract makes the manner of its performance a matter of its own discretion, the law does not hesitate to imply the proviso that such discretion be exercised honestly and in good faith." *Ferrell v. Vic Tanny Int'l, Inc.*, 357 N.W.2d 669, 672 (Mich. App. 1984) (citing *Burkhardt v. City National Bank of Detroit*, 226 N.W.2d 678 (Mich. App. 1975) and 3A Corbin, Contracts, § 644, pp. 78-84). Defendant has pending with the Court a motion for reconsideration of the Court's August 4, 2017 opinion and order, and, in the alternative, motion for certification to the Michigan Supreme Court.

in substantially the same manner as the Business is being currently operated . . .," Plaintiffs do not identify a contractual provision requiring Defendant to run the Pharmacies in the same manner as they were run under Plaintiffs' ownership. (Am. Compl. ¶ 14.) There is no allegation that simply filling a specific number of prescriptions, or filling prescriptions at the same rate as under Plaintiffs' ownership, constitutes a violation of the Settlement Agreement.

Second, Defendant argues that "Plaintiffs do not allege facts to support the conclusion that 'the effect of [Walgreens'] breach [of the Settlement Agreement] could reasonably be expected to have an adverse effect on [Walgreens'] ability to consummate the transactions contemplated by [the APA]." (Def.'s Memo in Support 5.) Plaintiffs specifically allege that

> 78.    A breach of the Settlement Agreement by Defendant (among other penalties) would have caused Defendant to no longer be able to sell the controlled substances which were the subject of the Settlement Agreement.
>
> 79.    To consummate the transactions contemplated by the Agreement, Defendant would have had to pay the Deferred Portion of the Purchase Price.
>
> 80.    A breach of the Settlement Agreement could reasonably be expected to have an adverse effect on Defendant's ability to consummate the transactions contemplated by the Agreement, including the payment of the Deferred Portion of the Purchase Price, because without the filling of prescriptions of the controlled substances which were the subject of the Settlement Agreement, Defendant could not have retained an average of 810 prescriptions a day at the Two Drugstores after Closing.

(Am. Compl. ¶¶ 78-80.) The Court need not reach this portion of the argument where Plaintiffs have failed to plead facts that could support finding that the execution, delivery or performance of the APA would constitute a breach of the Settlement Agreement. Yet it is worth noting that should Defendant breach the Settlement Agreement, and as a result,

become ineligible to fill an entire or part of a category of drugs during the 12 to 24-month period following the Closing Date, such a limitation could reasonably be expected to have an adverse effect on the condition to payment of the Retention Earnout: the filling of a specific average number of prescriptions.

Defendant's motion to dismiss as to Count IV will be granted and the claim dismissed with prejudice.

### B.      Whether Plaintiffs State a Claim For Silent Fraud - Count V

In Count V, Plaintiffs allege silent fraud. Defendant argues that Plaintiffs' silent fraud claim is barred by the APA's integration clause and the economic-loss doctrine and that it fails to meet Fed. R. Civ. P. 9(b)'s heightened pleading standard. Plaintiffs rely on their prior response to the first motion to dismiss for their arguments regarding the integration clause and the economic loss doctrine.[2] Silent fraud "holds that when there is a legal or equitable duty of disclosure, '[a] fraud arising from the suppression of the truth is as prejudicial as that which springs from the assertion of a falsehood, and courts have not hesitated to sustain recoveries where the truth has been suppressed with the intent to defraud." *Titan Ins. Co. v. Hyten*, 817 N.W.2d 562, 569 (Mich. 2012) (citing *Tompkins v. Hollister*, 27 N.W. 651 (Mich. 1886)). To recover, Plaintiffs need "to show that [Defendant] had a duty to disclose a material fact and failed to do so." *Westfield Ins. Co. v. Enterprise 522, LLC*, 34 F. Supp. 3d 737, 747 (E.D. Mich. 2014) (citing *Lorenzo v. Noel*, 522 N.W.2d 724, 725

---

[2] With respect to both the indemnity clause and economic loss doctrine arguments, Plaintiffs assert that Defendant's arguments are simply a motion for reconsideration of the Court's prior ruling on these issues. The Court's August 4, 2017 opinion and order allowed Plaintiffs to replead two counts. Defendant's motion to dismiss and these two arguments respond to the newly amended claims and the Court will address them.

(Mich. App. 1994)); *see also Cassidy v. Cassidy*, 899 N.W.2d 65, 88 (Mich. App. 2017) ("In order for the suppression of information to constitute silent fraud there must be a legal or equitable duty of disclosure.").

> The elements of silent fraud are: (1) the defendant failed to disclose a material fact about the subject matter at issue; (2) the defendant had actual knowledge of the fact; (3) the failure to disclose the fact gave the plaintiff a false impression; (4) when the defendant failed to disclose the fact, he or she knew that the failure to disclose would create a false impression; (5) when the defendant failed to disclose the fact, he or she intended that the plaintiff rely on the resulting false impression; (6) the plaintiff indeed relied on the false impression; and (7) the plaintiff suffered damages resulting from his or her reliance.

*City of Dearborn v. Burton-Katzman Dev. Co.*, 2014 WL 7212895, at *10 (Mich. Ct. App. Dec. 18, 2014) (citing *Hord v. Envtl. Research Inst. of Michigan*, 579 N.W.2d 133 (Mich. Ct. App. 1998)); *see also Clement-Rowe v. Michigan Health Care Corp.*, 538 N.W.2d 20, 23 (Mich. App. 1995) ("The false material representation needed to establish fraud may be satisfied by the failure to divulge a fact or facts the defendant has a duty to disclose.").

### 1. Integration Clause

Defendant relies on *Hamade v. Sunoco, Inc.,* and *UAW-GM Human Resource Center v. KSL Recreation Corp.*, for the premise that under Michigan law, an integration clause bars fraud claims unless the alleged fraud invalidates the integration clause itself. *See Hamade v. Sunoco Inc.*, 721 N.W.2d 233, 249 (Mich. Ct. App. 2006) ("when a contract contains a valid merger clause, the only fraud that could vitiate the contract is fraud that would invalidate the merger clause itself, i.e., fraud relating to the merger clause or fraud that invalidates the entire contract including the merger clause); *UAW-GM Human Res. Ctr. v. KSL Recreation Corp.*, 579 N.W.2d 411, 419 (Mich. Ct. App. 1998). The APA contains

an integration clause at section 13.5, providing in part that

> This Agreement and the Exhibits and Schedules referred to herein and the documents delivered pursuant hereto contain the entire understanding of the parties hereto with regard to the subject matter contained herein or therein, and supercede all prior agreements, understandings or letters of intent between or among any of the parties hereto, including any confidentiality agreement between the parties or their Affiliates. This Agreement shall not be amended, modified or supplemented except by a written instrument signed by an authorized representative of each of the parties hereto.

(APA § 13.5.)

According to Plaintiffs, this argument does not take into account a distinction between information suppressed in the making of the contract versus a contractual term. Plaintiffs allege that prior to the time the APA was executed, Defendant had actual knowledge of material facts, including Defendant's compliance program obligations pursuant to its Settlement Agreement with DOJ and DEA, which it did not disclose to Plaintiffs.[3] This is a relevant distinction. Plaintiffs allege that by such failure to disclose, they were given a false impression that there would not be a meaningful reduction in the number of Average Customer Prescriptions after the Closing. (Am. Compl. ¶ 88.)

> Silent fraud . . . involves information that has been deliberately and deceptively withheld by one of the contracting parties. Undisclosed material facts that were never the subjects of precontractual negotiations are not absorbed by a contract. A contrary ruling would immunize from liability a contracting party who suppressed information that it was duty-bound to

---

[3] Alleged material facts "relating to the likelihood that the Average Customer Prescriptions would substantially decline after the Closing" include "(a) Defendant's intent to not maintain sufficient inventories at the pharmacies at the Two Drugstores in order to meet customer/patient needs; (b) Defendant's intent to operate the pharmacies at the Two Drugstores without sufficient staff to meet customer/patient needs; (c) Defendant's intent to eliminate lottery sales at the Two Drugstores; (d) the existence of the Settlement Agreement and the Walgreen Compliance Obligations pursuant to the Settlement Agreement; and (e) the implementation of the GFD Checklist." (Am. Compl. ¶ 84.)

13

include in the parties' discussions.

*Abbo v. Wireless Toyz Franchise, L.L.C.*, 2014 WL 1978185, at *5 (Mich. Ct. App. May 13, 2014). In *Abbo*, the Michigan Court of Appeals considered the language of the merger agreements, noting that they applied to "any and all prior or contemporaneous agreements, whether oral, written, express or implied, between the parties with respect to the subject matter" and "all previous written and oral agreements or understandings between the parties," noting that it would "enforce this unambiguous contractual language according to its plain terms." *Id.* at *6. The court also noted that neither of the merger clauses at issue made "reference to prior 'representations' or 'inducements.'" *Id.* The court concluded that "[w]hile the merger clauses disclaimed 'any and all prior agreements or understandings,' they did not preclude the admission of factual representations regarding matters unaddressed by the contract." *Id.*

Similarly, the merger clause at issue provides that the APA, Exhibits and Schedules contain the "entire understanding of the parties hereto with regard to the subject matter herein" and "supercede[s] all prior agreements, understandings or letters of intent" and its plain language does not preclude the admission of parol evidence that Defendant fraudulently concealed the Settlement Agreement with DOJ and DEA or its intent to operate without sufficient staff or inventory, and eliminate lottery sales. (APA § 13.5; Am. Compl. ¶ 84.) Unlike those cases on which Defendant relies, Plaintiffs do not allege an agreement collateral to the APA. *See Hamade*, 721 N.W.2d at 249 (agreement contained a merger clause; the plaintiff elected to forgo a term that would have given him an exclusive territory on the basis of the defendant's alleged representation and the plaintiff knew the term was not included in the agreement when he signed it; the plaintiff's "only claim on appeal is that

14

he was led to believe that he did not need such a clause"; the alleged oral representation by the defendant regarding the authorization of future service stations was also expressly nullified by language in the integration clause); *UAW-GM Human Res. Ctr.*, 579 N.W.2d at 419 ("fraud that relates solely to an oral agreement that was nullified by a valid merger clause would have no effect on the validity of the contract"). Instead, as set forth in further detail below, Plaintiffs allege that the failure to disclose material facts gave Plaintiffs a false impression "that there would not be a meaningful reduction in the number of Average Customer Prescriptions after the Closing." (Am. Compl. ¶ 88.) Plaintiffs have plead enough to state a plausible fraud claim that would not be barred by the inclusion of the integration clause.

### 2. Economic Loss Doctrine

As in the first motion to dismiss, Defendant argues that the silent fraud claim is barred by the economic loss doctrine. "Generally, under Michigan law, a plaintiff '[may] not maintain an action in tort for nonperformance of a contract.'" *DBI Investments, LLC v. Blavin*, 617 Fed. Appx. 374, 381 (6th Cir. 2015) (quoting *Ferrett v. Gen. Motors Corp.*, 475 N.W.2d 243, 247 (Mich. 1991)). A tort claim is available where it is "extraneous to the contractual dispute." *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.,* 532 N.W.2d 541, 545 (Mich. Ct. App. 1995). "Michigan courts must inquire whether the legal duty allegedly violated by a defendant 'arise[s] separately and distinctly from a defendant's contractual obligations.'" *DBI Invs., LLC*, 617 Fed. Appx. at 381. For example, claims have been allowed for "negligence resulting in physical harm to third parties" or "retaliatory discharge of an at-will employee contrary to public policy." *Id.* However, "tort claims based on negligent performance or nonperformance of a contract resulting in only economic

harm" have been rejected under the economic loss doctrine. *Id.* Defendant argues that the damages Plaintiffs claim are wholly interwoven with the terms of the APA and Plaintiffs' agreement to a prescription-based compensation structure. (Def.'s Br. 10.)

In response to the prior motion to dismiss, Plaintiffs likened their silent fraud claim to one for fraud in the inducement, in that both related to the procurement of contractual promises through fraud. (Pls.' Resp. 24-25, dkt. 20.) As the Court pointed out in its prior opinion and order, *DBI Investments* recognized that in Michigan, fraudulent inducement is an exception to the economic loss doctrine, where, as alleged here, it is extraneous to the contract. Defendant argues that Plaintiffs have not plead fraud in the inducement and that it is a defense to contract.

Although Plaintiffs' claim is that of silent fraud, it is similar in theory and consequence to fraud in the inducement.

> Fraud in the inducement presents a special situation where parties to a contract appear to negotiate freely -- which normally would constitute grounds for invoking the economic loss doctrine-- but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior. In contrast, where the only misrepresentation by the dishonest party concerns the quality or character of the goods sold, the other party is still free to negotiate warranty and other terms to account for possible defects in the goods.

*Huron Tool and Eng'g Co.*, 532 N.W.2d at 545, 546 (The court, finding that plaintiff's claims do not fall "outside the ambit of the economic loss doctrine," noted that the "fraudulent representations alleged by plaintiff concern the quality and characteristics of the software systems sold by defendants. These representations are indistinguishable from the terms of the contract and warranty that plaintiff alleges were breached. . . . Because plaintiff's allegations of fraud are not extraneous to the contractual dispute, plaintiff is restricted to

its contractual remedies under the UCC.") The reasoning behind allowing fraud in the inducement as an exception to the economic loss doctrine, as discussed in *Huron Tool*, contemplates a situation similar to that alleged by Plaintiffs. For example, Plaintiffs' ability to negotiate the terms of compensation under the agreement was hindered or undermined by not knowing that Defendant, and the Pharmacies by association, would be subject to additional procedures that would result in fewer prescriptions being filled and that Defendant would take other steps to reduce both customer traffic and the number of prescriptions filled. Here, the suppression of information related to a reduced likelihood of Defendant continuing to fill prescriptions at the Pharmacies' pre-Closing levels and led Plaintiffs to agree to the compensation structure that put nearly 40% of the purchase price at risk. Plaintiffs argue that Defendant's failure to disclose certain information gave them a "false impression' that there would not be a meaningful decrease after closing. (Am. Compl. ¶ 88.)

Although *DBI Investments*, on which Defendant relies, found that the plaintiff's allegations of fraud were barred by the economic loss doctrine, the case is distinguishable. *DBI Invs., LLC*, 617 Fed. Appx. 374. *DBI Investments* also noted that "not all tort claims, . . . are barred by the existence of a contract." *Id.* at 381. Citing *Huron Tool*, the court pointed out that "[c]laims of fraud 'extraneous to the contract' are permissible, whereas 'fraud interwoven with breach of contract' cannot support an independent claim." *Id.* at 382. The court concluded that the plaintiff's allegations of fraud based on the defendant's representation of dissolution procedures were "essentially claims of nonperformance of the relevant contract provisions governing that procedure." *Id.* at 383. The plaintiff had not alleged "any statements related to dissolution extraneous to these provisions that 'tricked'

it into entering into the contract." *Id.* The court came to a similar conclusion with respect to the plaintiff's claim that the defendant "misrepresented the effect of the performance compensation structure," which "concerned the operation of a contract provision with which both parties were directly familiar." *Id.* The court noted that the plaintiff, an entity controlled by two sophisticated business men, "cannot claim that it was tricked into [the agreement] based on [the defendant's] emphasis on the positive aspects of the arrangement." *Id.* "Nothing prevented Plaintiff in this context from foreseeing the downside as well as the upside of a performance-based compensation structure." *Id.*

On the contrary, Plaintiffs' allegations in the case at bar are that something very specific prevented Plaintiffs from seeing the downside of the compensation structure of the APA. Plaintiffs' allegations are not merely "'interwoven' with the nonperformance or foreseeable effect of contract terms. *Id.* Plaintiffs claims are that Defendant possessed information and knowledge prior to Closing that at the time of Closing, the Pharmacies would be subject to procedures that would decrease prescription numbers and that Defendant would institute additional practices (decrease stock and staff, discontinue lottery sales) to further decrease the number of prescriptions filled.

Plaintiffs have plead enough to maintain that their silent fraud claim is not simply an action for nonperformance of the APA, and that the fraud they allege is distinguishable from the terms of the contract.

### 3.    Fed. R. Civ. P. 9(b)

Finally, Defendant argues that Plaintiffs have not plead their fraud claim sufficiently to meet the standards of Fed. R. Civ. P. 9(b), which requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or

18

mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "Rule 9(b) is not to be read in isolation, but is to be interpreted in conjunction with Federal Rule of Civil Procedure 8 ." *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 503 (6th Cir. 2007). The Sixth Circuit has held that Rule 9(b) requires that Plaintiffs "allege the time, place, and content of the alleged misrepresentations on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud" or, "the 'who, what, when, where, and how' of the alleged fraud." *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006) (citations omitted). "The threshold test is whether the complaint places the defendant on 'sufficient notice of the misrepresentation,' allowing the defendants to 'answer, addressing in an informed way plaintiff[']s claim of fraud.'" *Coffey v. Foamex L.P.*, 2 F.3d 157, 162 (6th Cir. 1993) (internal citations omitted).

Despite Defendant's argument to the contrary, Plaintiffs have pled considerably more than "legal conclusions and generalizations." (Def.'s Mem. 9.) Plaintiffs specifically identified Defendant, Walgreen Co., as having knowledge of and withholding the following information: the existence of the Settlement Agreement and the effect of its requirements on the number of prescriptions filled, and the intent to discontinue lottery sales and to maintain insufficient staff and inventory at the pharmacies. (Am. Compl. ¶¶ 59-62, 67, 83-86.) Plaintiffs have also identified the time frame in which the alleged information was known to Defendant and withheld as being prior to entering into the APA. (Am. Compl. ¶¶ 59, 60, 62, 67 ("Prior to the time the Original APA was executed, according to an employee of Defendant . . ."), 83, 84.) Plaintiffs specifically allege that Defendant intended Plaintiffs rely on the false impression given by the suppression of certain information, and that

Plaintiffs did so. (Am. Compl. ¶¶ 89-90). Although "intent, knowledge, and other conditions of a person's mind may be alleged generally," Plaintiffs identified the intent and motive in part by pointing out that "the amount of lost profits from a reduction of the Average Customer Prescriptions from 810 to 609 during the First Twelve Month Period was less than the $4 million Defendant would be permitted to retain from the Deferred Portion of the Purchase Price as a result of such a reduction in the Average Customer Prescriptions." (Fed. R. Civ. P. 9(b); Am. Compl. ¶¶ 48, 82.)

With respect to the allegedly withheld information, Plaintiffs argue that "[t]here is an equitable duty of disclosure in a business transaction when 'circumstances surrounding a particular transaction are such as to require the giving of information . . . .'" *Hand v. Dayton-Hudson*, 775 F.2d 757, 759 (6th Cir. 1985) (citing *Ainscough v. O'Shaughnessey*, 78 N.W.2d 209, 214 (Mich. 1956)); *see also Sullivan v. Ulrich*, 40 N.W.2d 126, 131 (Mich. 1949) ("Fraud may be consummated by suppression of a material fact by either party to a contract of sale which he is in good faith bound to disclose, as well as by open false assertions since by such suppression there is fraudulently produced a false impression upon the mind of other party."). With respect to such a duty, Plaintiffs have alleged, for example, that Defendant did not inform them of the Settlement Agreement, nor that it would "be in effect for approximately twenty-two months after the closing" (and became applicable to the Pharmacies upon Closing) and that, prior to the Closing and as a result of the Compliance Obligations related to the Settlement Agreement, Defendant had been "turning away customers from its drugstores and had begun refusing to fill prescriptions of controlled substances which were the subject of the Walgreens Compliance Obligations." (Am. Compl. ¶¶ 60-65, 82, 83; *see also* Am. Compl. ¶¶ 84-86.) In considering Plaintiffs'

other claims, this Court has acknowledged that neither party has identified a provision requiring Defendant to operate that Pharmacies in the same manner that they were run prior to closing. Yet Plaintiffs allege that "Defendant implicitly agreed to: 'conduct the Business after Closing in substantially the same manner as the Business is being currently operated without loss of patient information *and without interruption of service to patients or Payment Programs, billing or collection, or other material aspect of the Business,"* relying on a provision that required Plaintiffs to "reasonably cooperate" with Defendant to enable such a continuation. (Am. Compl. ¶ 14; APA 8.15.). Although the Court found in its prior opinion and order that Plaintiffs had not plead a breach of contract based on this provision, Plaintiffs argument that it had "no reason to believe that the business of the Two Drugstores would not continue as it had for years and . . . there would be an average of 810 prescriptions a day at the Two Drugstores after Closing" is not unreasonable in light of such a provision. (Pls.' Resp. 16.) As Plaintiffs point out, the deferred portion of the purchase price is "an extremely significant part of the consideration" and had Plaintiffs known the material facts suppressed by Defendant, they would have known "there was little likelihood that an average of 810 prescriptions per day" would continue to be filled after closing, and such facts "were critical to an evaluation of whether it was likely that the Deferred Portion of the Purchase Price was going to be paid." (Pls.' Resp. 16.)

Defendant argues that this was a routine business transaction, and that the existence of the settlement agreement was "readily accessible to the other party by the exercise of due diligence." (Def.'s Reply 6.) Michigan courts recognize that with respect to the doctrines of silent fraud, actionable fraud and innocent misrepresentation, "none of these doctrines requires that the party asserting fraud prove that the fraud could not have

been discovered through the exercise of reasonable diligence." *Titan Ins. Co.*, 817 N.W.2d at 569.

Finally, Plaintiffs' failure to request rescission of the APA is not a bar to their fraud claim. "The legal and equitable remedies for fraud are manifold. Fraud in the procurement of the contract may be grounds for monetary damages in an action at law, . . . or, . . . grounds to retroactively avoid contractual obligations through traditional legal and equitable remedies such as cancellation, rescission, or reformation." *Id.* at 569. "[S]uch remedies may be limited or narrowed by statute." *Id.* Michigan courts have "held that a plaintiff may seek rescission and damages for fraud, despite that one requires affirmance of the contract while the other demands disavowal, as long as the jury picks one theory and does not award double recovery." *Abbo*, 2014 WL 1978185, at *13 (citing *Jim-Bob, Inc. v. Mehling*, 443 N.W.2d 451 (Mich. App. 1989)).

These are adequately specific allegations of the silent fraud claim to survive dismissal. While it remains to be seen whether this case will survive a motion for summary disposition, Defendant's motion to dismiss this claim will be denied.

## IV. CONCLUSION

For the reasons set forth above the Court GRANTS in part Defendant's motion to dismiss (dkt. 28) and dismisses with prejudice Count IV.

The Court DENIES Defendant's motion as to Count V.

**SO ORDERED.**

 s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  January 4, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on January 4, 2018, by electronic and/or ordinary mail.

s/ Lisa C. Bartlett
Case Manager